**Tommy Javone SEAMSTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–10–00884–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 30, 2011.

Bob Wicoff, Houston, for Appellant.

Lisa G. Porter, Houston, for State.

Panel consists of Justices FROST, JAMISON, and McCALLY.

**OPINION**

SHARON McCALLY, Justice.

A jury convicted appellant Tommy Javone Seamster of one count of aggravated robbery and assessed punishment at twenty years' imprisonment. Appellant moved

for a new trial based on an allegation of ineffective assistance of counsel, and the trial court denied the motion after holding an evidentiary hearing. Appellant challenges his conviction on the single ground that the trial court abused its discretion by denying the motion for new trial. We affirm.

## BACKGROUND

At about 10:00 a.m. on December 26, 2009, two men entered the convenience store of a Shell gas station where Sonny Singh worked. One of the robbers, with his face exposed at first, pointed a gun at Singh and demanded all the money. The robbers fled with the money from the cash register. Later that day, Deputy Craig Berry of the Harris County Sheriff's Office apprehended appellant and codefendant DeAndre Parker and brought them back to the scene of the crime. Among other evidence the State presented at trial, Deputy Alejandro Adames testified that Singh positively identified appellant during a show-up identification. Singh testified that he was "sure" about the show-up identification. He also made an in-court identification, implicating appellant as one of the two robbers. The jury found appellant guilty.

After trial, appellate counsel filed a motion for new trial alleging that trial counsel Patrick Ruzzo rendered ineffective assistance because he failed to conduct an investigation that would have revealed a video showing Singh's failure to pick appellant's picture from a photo spread. The trial court held a hearing on the motion. Sabrina Green testified that she was assisting with the production of a television show called "The Defendant" for a television production company. The production company obtained information per-

taining to appellant's case from his bonding company, and the production company recorded a video of an interview with Singh in May 2010.

During the interview, Singh was asked if he could identify either of the robbers if provided with an array of photos.[1] Singh responded, "I think I should be able to." The video reflects the following exchange with approximate timestamps noted:

Interviewer [0:09]: So, I'm going to show you some pictures that may or may not be the person. Uh, and you just kind of point out.

Singh [0:14]: Ah, I'll try my best. It's been so long I haven't remembered that, you know, at that time I told them on that day I was so certain, but it's been over five months, but I'll try my best if I can.

[At 0:32, the interviewer lays out five individual photos on the counter, and Singh begins looking at the photos.]

Singh [0:37]: [Pointing to one photo.] Not this guy.

Singh [0:50]: I think he was, um.

Singh [1:03]: I [inaudible] want to be 100% sure which one was it that day. I, I—

Interviewer [1:07]: He may or may not be there at all.

Singh [1:10]: Yeah, that, that's what I'm saying. I'm not 100% sure.

Singh [1:15]: [Not indicating.] That guy, no. Not that one.

Singh [1:19]: I'm not 100% sure out of these ones. I don't want to just pinpoint at somebody and say that was it.

[At 1:26, Singh furrows his brow for a moment as if puzzled or concentrating intently.]

---

**1.** The relevant portion of the video and the photos displayed in the video were admitted into evidence during the hearing and are part of the record on appeal.

Singh [1:36]: I don't want to make any guesses on these ones. I think it wasn't that guy. [Indicating to the photo previously excluded.]

Singh [1:47]: [Singh stops looking at photos.] I don't want to make any guesses.

The photo spread included one photo of appellant and one photo of Parker. From timestamp 0:32, when the photos are placed on the counter, to 1:47, Singh does not appear to take his eyes off the photos.

After the interview, Green left a voicemail for Ruzzo, saying that she "had information in regards to Tommy Seamster's hearing." The record does not reflect whether Ruzzo received or listened to the message, but he testified that he did not learn about the production company's interview with Singh until immediately after trial when appellant's mother told him about the video. Appellant's mother testified that she told Ruzzo about the video five or six times prior to trial. Appellant testified that he told Ruzzo, "We have information [that] could help in my case," but he did not specifically mention the photo spread, video, or television production company. Parker's lawyers learned of the video's existence from Parker's family, and one of his lawyers testified that they would have obtained a copy of the video if Parker's case had gone to trial.[2] Ruzzo did not recall speaking with Parker's lawyers, though he may have done so once in the courtroom.

Finally, Ruzzo testified that he did not send his investigator to the scene of the crime to interview Singh. However, Ruzzo testified that he interviewed Singh prior to trial, and Singh told Ruzzo that Singh "could identify the person in the robbery." At trial, Singh testified that he did not talk to Ruzzo before trial.

The trial court denied appellant's motion for new trial, and this appeal followed.

## ANALYSIS

Appellant argues that the trial court abused its discretion in denying his motion for new trial. In particular, appellant argues (1) Ruzzo was deficient by failing to adequately investigate his case, which resulted in Ruzzo's inability to impeach Singh's identification testimony with the television production company's video, and (2) this failure to investigate caused appellant prejudice by undermining confidence in the outcome of the trial.

To prevail on an ineffective assistance claim, an appellant must show that (1) counsel's performance was deficient by falling below an objective standard of reasonableness and (2) counsel's deficiency caused the appellant prejudice—there is a probability sufficient to undermine confidence in the outcome that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Perez v. State,* 310 S.W.3d 890, 892–93 (Tex.Crim. App.2010). An appellant must satisfy both prongs by a preponderance of the evidence; failure to demonstrate either deficient performance or prejudice will defeat a claim of ineffectiveness. *Perez,* 310 S.W.3d at 893.

When, as here, the prejudice prong of the *Strickland* test is dispositive, we need address only that prong on appeal. *See My Thi Tieu v. State,* 299 S.W.3d 216, 225 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd) (citing *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052). We review de novo the trial court's decision on the prejudice prong while giving deference to the trial court's implied resolution of underlying

**2.** The case against Parker was dismissed prior to trial.

factual determinations in support of the denial of the motion for new trial. *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim.App.2005) (quoting *Charles v. State*, 146 S.W.3d 204, 213 (Tex.Crim.App.2004), *superseded by* Tex.R.App. P. 21.8(b) (amended 2007)).[3]

To determine whether an appellant has established prejudice based on counsel's failure to investigate and introduce evidence, we look to the totality of the evidence to determine whether there is a reasonable probability—one sufficient to undermine our confidence in the verdict— that but for counsel's failure to investigate and obtain certain evidence, the jury "would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 694–95, 104 S.Ct. 2052; *Perez*, 310 S.W.3d at 894. This inquiry requires us to "reweigh the evidence" supporting appellant's conviction "against the totality of available ... evidence," including the evidence that could have been offered if counsel had performed a proper investigation. *See Wiggins. v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (weighing the evidence of aggravation in sentencing against the totality of available mitigating evidence that counsel did not discover as a result of a deficient investigation); *Perez*, 310 S.W.3d at 896 ("We compare the evidence presented by the State with the evidence the jury did *not* hear due to

trial counsel's failure to investigate." (quotation omitted)).

Accordingly, two important considerations are (1) the overall strength of the State's case and (2) the potential value to the defense of the undiscovered evidence. *See Perez*, 310 S.W.3d at 895–96 (explaining "we must also consider the relative strength of the State's case"; conceding that "the State's case was not strong"; but finding no prejudice in counsel's failure to investigate an alleged alibi witness because the witness's testimony was "too vague to be of any benefit" to the defendant and did not provide the defendant with an alibi for part of the time the burglary could have been committed); *see also Strickland*, 466 U.S. at 696, 104 S.Ct. 2052 ("Moreover, a verdict ... only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Anderson v. Johnson*, 338 F.3d 382, 393–94 & n. 55 (5th Cir.2003) (concluding that the defendant was prejudiced by counsel's failure to investigate and present exculpatory evidence when the totality of the evidence against the defendant was "relatively weak" rather than "overwhelming," and the undiscovered evidence "would have been a powerful rebuttal" to the State's evidence).

Here, the overall strength of the State's case against appellant is neither "weak" nor "overwhelming," but somewhere in the middle.[4] In addition to Singh's on-scene

---

3. Appellant acknowledged at oral argument that we should defer to the trial court's implied factual findings based on conflicts in the evidence. We assume that Ruzzo interviewed Singh prior to trial. We also assume that Ruzzo was not specifically told about the existence of the video before the jury rendered its verdict. Specifically, we disagree with appellant's assertions that "the videotape of such interview with the complainant was made known to defense counsel, ... and [counsel] did not contact the complainant, either him-

self or through an investigator, until trial started."

4. *Compare Anderson*, 338 F.3d at 393–94 (concluding the State's case for attempted kidnapping was "weak" when the evidence consisted primarily of eyewitness identification of the defendant as the perpetrator, which resulted from the victim's fortuitous encounter with the defendant three years after the crime), *and Perez*, 310 S.W.3d at 896 (concluding the State's case for robbery was "not strong" when three witnesses testified and the only witness to identify the defendant

and in-court identifications, the State presented evidence linking appellant to (1) the getaway vehicle, (2) a second vehicle, which in turn was linked to the acquisition of and departure from the getaway vehicle, and (3) a codefendant, who was also linked to the two vehicles near the time of the robbery. The State also presented a witness who identified appellant as one of two robbers during another armed robbery at a nearby Shell gas station the same morning.

In greater detail, the State presented the following evidence:

- Elliot Turner testified that at about 9:38 a.m. on December 26, 2009, he observed two black males stealing his black Dodge Intrepid near his apartment on Aldine Bender Road. One of the men used a screwdriver to steal the Intrepid, while the other man sat in a "goldish, tannish color" Buick Park Avenue. The man in the Buick showed Turner a gun and said, among other things, "It's our car now." At a show-up identification later that day, Turner "clearly" identified Parker as the man with the screwdriver. Turner also made a tentative identification of appellant as the man with the gun in the gold Buick.[5] A few days later, Turner picked both appellant and Parker out of photo spreads and noted that appellant was the man with the gun sitting in the gold Buick. Finally, Turner made an in-court identification of appellant as the man with the gun in the gold Buick.

- Singh testified that he was robbed at about 10:00 a.m. while he worked at a Shell gas station located at the intersection of Beltway 8 and Veteran Road. Singh identified the color, make, and model of the getaway vehicle as a black Dodge Intrepid, and he recorded the license plate as PZK 994. He gave this information to police shortly after the robbery. Later that day, both appellant and Parker were brought to the scene of the crime, and Singh identified appellant as the robber with a gun. Singh did not identify Parker as one of the robbers. Singh also made an in-court identification of appellant as the robber with the gun.

- Meybel Guvera testified that she was working at a different Shell gas station located at the intersection of Beltway 8 and Tidwell Road. During the morning on December 26, 2009, two black men robbed her. One of the men

as the robber, whose face was partially obscured by a bandana, was a thirteen-year-old boy who also disagreed with the only other eyewitness as to the time of the robbery by a period of two hours), *with Howard v. State*, 239 S.W.3d 359, 368 (Tex.App.-San Antonio 2007, pet. ref'd) (concluding the evidence was "overwhelming" for aggravated assault when it consisted of the testimony of four people who testified that they witnessed the defendant cut or stab the complainant); *Novak v. State*, 837 S.W.2d 681, 684 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (concluding the evidence was "overwhelming" for aggravated robbery when it consisted of the complainant's positive identification on the night of the robbery, the complainant's in-court identification, testimony that appellant's accomplice was seen with appellant near the complain-

ant's home shortly after the robbery at a time when no businesses in the area were open, the appellant and accomplice split up when officers approached in a patrol car, the accomplice fled from police, and the accomplice had the following items on his person at the time of arrest: the complainant's gun, holster, ammunition, chemical mace spray, ATM card, Social Security card, and camera).

5. Turner explained, "His lips were familiar but I guess in the car he—I thought he was a little brighter than he actually was in person. I was really only able to identify the car and his muscle shirt and his lips I remembered. But I did think he was a little brighter than he came out to be."

waved a gun in her face. Later that day, she identified appellant as one of the robbers during a show-up identification. She also made an in-court identification of appellant as the robber with the gun.

- Kenedy Munguia testified that he was at the intersection of Tidwell Road and Van Hut at some point between 11:00 a.m. and 12:00 p.m. on December 26, 2009. He observed a "bluish black" Dodge Intrepid drive off the side of the roadway and crash. Two black men exited the Intrepid, ran across a road, and entered a "brownish, goldish color four door" Buick. Munguia noticed that the Buick had a white cardboard or paper license plate on the rear, and he did not remember seeing a license plate on the front. Munguia called police to report the incident, and later that day, he was asked to drive to a Shell gas station to identify the men running from the Intrepid. During a show-up identification, Munguia identified appellant as one of the men running from the Intrepid and entering the Buick. He also made an in-court identification of appellant as one of the men. The abandoned Intrepid that

Munguia observed was later recovered by police; the license plate was RZK 884.

- Deputy Craig Berry testified that he was driving on Tidwell Road when he observed a gold Buick parked near a convenience store. He noticed that the Buick had a paper license plate on the back and no front license plate. As appellant and Parker exited the store in the direction of the Buick, Deputy Berry and another deputy intervened. The deputies brought appellant and Parker to the Shell gas stations for the show-up identifications discussed above.[6]

In evaluating the strength of the State's case, we also note the State did not introduce any of the following into evidence: a gun, stolen proceeds, a mask or sweatshirt the robber with the gun wore during the robbery, or any forensic evidence linking appellant to the Intrepid or the crime scene.

Next, we consider the potential value of the undiscovered evidence—a video showing that Singh was unable or unwilling[7] to pick appellant's photo out of a photo spread—and weigh the totality of evidence against the State's evidence. Appellant

---

**6.** Appellant testified that Parker drove him to this convenience store in Parker's gold Buick Park Avenue.

**7.** The State argues in its brief that the video "does not prove that Mr. Singh could not identify appellant." Similarly, at oral argument, the State argued that the video does not "conclusively prove" that Singh was "unable" to identify appellant. The State is correct, but our review of the undiscovered evidence is not limited to what the evidence "proves." We consider the evidence in a broader light, looking to what conclusions a jury could draw from the evidence. *See Kyles*, 514 U.S. at 453–54, 115 S.Ct. 1555 (holding that the State's failure to disclose certain evidence undermined confidence in the outcome of the trial; and evaluating the evidence in terms of what "[t]he jury would have been entitled to

find"—described as "possible findings"— rather than what the evidence conclusively established); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.1985) (refusing to "retry the case in our imaginations" and explaining that the impeachment evidence had the "potential for both the destruction of [a witness's] identification of [the defendant] and the discrediting, in some degree, of the police methods employed in assembling the case against him"). Given that Singh looked at the photos for over a minute, was able to exclude one person as a robber, and refused to identify anyone else as a robber because he was "not 100% sure," a jury would be entitled to find that Singh was either unwilling or unable to identify appellant from the photo spread.

has cited no case in which an attorney's proper investigation under *Strickland* would have revealed the type of impeachment evidence involved in this case. Our review of reported decisions similarly shows that many failure-to-investigate-witness cases involve more direct favorable evidence—for example, alibi witnesses, eyewitnesses who disclaim the defendant as the perpetrator, or eyewitnesses who actually identify another person as the perpetrator.[8]

The type of impeachment evidence at issue in this case, where Singh was either unable or unwilling to identify appellant in a photo spread administered by a television production crew rather than law enforcement, is markedly different from the very clear "undiscovered witness" exculpatory evidence at issue in the ineffective assistance cases cited above. The impeachment evidence at issue in this case is more similar to the type of evidence that an investigative State agency would collect: a witness's failure or refusal to make an identification before trial. In some cases, the State does not turn over such impeachment evidence to a defendant in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See, e.g., Hall v. State,* 283 S.W.3d 137, 177–78 (Tex.App.-Austin 2009, pet. ref'd) (reversing for a new trial on punishment when the State failed to disclose that a key punishment witness who attributed statements to the defendant and made an in-court identification had been unable to pick the defendant's photo from of a photo spread before trial). Because the analysis of whether evidence is "material" under *Brady* is identical to whether a defendant is prejudiced under *Strickland,*[9] we find those cases persuasive for resolving appellant's ineffective assistance claim.

We acknowledge that "eyewitness testimony is highly regarded by juries, rather

---

8. *See, e.g., Anderson,* 338 F.3d at 385, 393–94 (finding prejudice when counsel failed to interview an eyewitness who would testify that the defendant was not the perpetrator); *Perez,* 310 S.W.3d at 895, 897 (finding no prejudice because the alleged alibi witness, whom counsel failed to present, only excluded the defendant as the perpetrator for part of the time period during which the crime was committed); *Butler v. State,* 716 S.W.2d 48, 56 (Tex. Crim.App.1986) (finding prejudice when counsel failed to discover two witnesses who would testify that someone other than the defendant was the robber and another witness who would testify that the defendant was somewhere else at the exact time of the robbery); *In re I.R.,* 124 S.W.3d 294, 302 (Tex. App.-El Paso 2003, no pet.) (finding prejudice when counsel failed to interview an alibi witness); *see also Beltran v. Cockrell,* 294 F.3d 730, 735 (5th Cir.2002) (finding prejudice when counsel failed to discover that the defendant's codefendant had a tattoo matching the description of the perpetrator, and counsel failed to then impeach three witnesses who had tentatively identified a codefendant rather than the defendant as the perpetrator).

9. *Johnson v. Scott,* 68 F.3d 106, 109–10 (5th Cir.1995) ("The materiality standard under *Brady v. Maryland* is identical to the prejudice standard under *Strickland.*"); *see Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution . . . ."); *see also United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the . . . prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."); *Johnson,* 169 S.W.3d at 230 ("And suppression of exculpatory evidence and ineffective assistance of counsel claims are governed by the *Strickland* materiality/prejudice standard: whether there is a reasonable probability that . . . the result of the proceeding would have been different." (alteration in original) (quotation omitted)).

more than its objective appraisal might warrant." *Smith v. Black,* 904 F.2d 950, 967 (5th Cir.1990), *vacated on other grounds by* 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992). Accordingly, the nondisclosure of evidence that could be used to impeach a key witness will often undermine confidence in the outcome, creating a reasonable probability that the result of the proceeding would have been different. *See id.; see also Kyles,* 514 U.S. at 433, 115 S.Ct. 1555 (noting that the Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes"). And as the United States Supreme Court has explained, the nondisclosure of evidence that would allow for the "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." *Kyles,* 514 U.S. at 445, 115 S.Ct. 1555 (citing *United States v. Agurs,* 427 U.S. 97, 112–13 n. 21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).[10]

In analyzing the issue before us, we focus on whether there is a reasonable probability that the jury would have had a reasonable doubt respecting guilt if Ruzzo had obtained and used the impeachment evidence. In *Lindsey v. King,* a case of "agonizing closeness," the Fifth Circuit reversed the defendant's conviction when two eyewitnesses identified the defendant as the murderer, but the State withheld impeachment evidence relating to only one of the witnesses. 769 F.2d at 1042–43. The first eyewitness had stated in an interview conducted over a week after the murder that he only saw a silhouette of the perpetrator and that viewing any photographs would be useless because he did not see the perpetrator's face. *Id.* at 1036.

His trial testimony, however, directly contradicted his prior statements: he testified that he saw the defendant's face and that he could have identified him on the night of the murder. *Id.* at 1040. He also made an in-court identification. *Id.* In light of the fact that this was a capital case, and another person at the scene of the crime allegedly bore a "striking resemblance" to the defendant, the Fifth Circuit decided to give the defendant "the benefit of the doubt" and reversed the conviction. *Id.* at 1042–43.

In *Kyles v. Whitley,* the Supreme Court similarly reversed a defendant's conviction for murder when the State presented four eyewitnesses who made a positive identification of the defendant as the perpetrator. 514 U.S. at 430, 455, 115 S.Ct. 1555. The State also presented evidence that the murder weapon with one spent cartridge, additional ammunition, a holster, and pet food matching the type purchased by the victim were found in the defendant's home, and the victim's purse was found in the defendant's garbage. *Id.* at 427–28, 115 S.Ct. 1555. Further, the defendant's fingerprint was found on a receipt from the grocery store where the victim had been shopping immediately before she was murdered; and the receipt itself was found in the victim's vehicle, which the murderer had driven away from the crime scene. *Id.* at 428, 115 S.Ct. 1555. Despite all of this strong evidence, the Court reversed because most of the evidence could have been called into doubt by a plethora of undisclosed impeachment evidence: one eyewitness initially gave police a description that did not match the defendant but rather matched the State's informant; one

10. *See also Lindsey,* 769 F.2d at 1043 ("[P]ositive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and ... the destruction by cross-examination of the credibility of one of two crucial witnesses—even if the other remains untouched—may have consequences for the case extending far beyond the discrediting of his own testimony.").

eyewitness had initially stated he had not seen the killer outside the victim's vehicle and that he had not seen the killing itself, but he testified later that he had seen the shooting; and finally, the State's informant, who did not testify but generally guided the investigation of the case, had given numerous inconsistent statements sufficient to raise suspicions of his own guilt, and he had both the motive and opportunity to plant the physical evidence linking the defendant to the crime. *See id.* at 453–54, 115 S.Ct. 1555.

The Court reasoned in *Kyles*, however, that it was the cumulative effect of the undisclosed impeachment evidence—which tainted both the identification of the defendant as the murderer and the physical evidence linking him to the crime—that created a "significantly weaker case" for the State, mandating reversal. *Id.* at 454, 115 S.Ct. 1555. The Court noted: "Perhaps, confidence that the verdict would have been the same could survive the evidence impeaching even two eyewitnesses if the discoveries of the gun and purse were above suspicion." *Id.*

Four years later, the Court reached a different result when the State withheld evidence that could have "severely impeached" the State's eyewitness who "provided the only disinterested, narrative account" of the defendant's abduction of the murder victim. *Strickler v. Greene*, 527 U.S. 263, 293, 296, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The witness gave very detailed testimony about how the defendant and two other people entered the victim's vehicle, attacked her, and forced her to drive away. *See id.* at 271–73, 119 S.Ct. 1936. The witness made an in-court identification of the defendant and identified the victim from a photo. *Id.* at 272,

119 S.Ct. 1936. She bolstered her own testimony: "I have an exceptionally good memory. . . . So I have absolutely no doubt of my identification." *Id.* at 272–73, 119 S.Ct. 1936. The undisclosed evidence included an investigator's notes that the witness could not identify the victim, could only identify a female accomplice, and was not sure whether she could identify the two men who entered the victim's vehicle (one of whom was the defendant). *Id.* at 273, 119 S.Ct. 1936. The witness also sent letters to an investigator, stating in part that she had not remembered being at the crime scene until her daughter jogged her memory, she had a "very vague memory that I'm not sure of," she had "muddled memories," and she questioned whether two of her memories were of the same person. *Id.* at 273–74, 119 S.Ct. 1936.

The Court in *Strickler* noted the "obvious significance" of the witness's testimony, *id.* at 296, 119 S.Ct. 1936, and acknowledged that "discrediting her testimony might have changed the outcome of the trial." *Id.* at 289, 119 S.Ct. 1936. Further, the trial court was "surely correct that there is a reasonable *possibility* that either a total, or just substantial, discount of [her] testimony might have produced a different result." *Id.* at 291, 119 S.Ct. 1936. However, the Court reiterated the test for materiality—"a reasonable *probability* of a different result"—and found such a probability lacking. *Id.* In reaching this conclusion, the Court noted the other significant eyewitness and physical evidence of guilt, which tied the defendant to the scene of the murder, the victim's vehicle, and the victim's personal belongings. *See id.* at 293–94 & n. 41, 119 S.Ct. 1936.[11]

11. The evidence included hair similar to the defendant's found at the crime scene, the defendant's possession of the victim's personal

belongings, an eyewitness placing the defendant near the scene of the crime, blood on the defendant's clothes, an accomplice's wallet

Although the evidence tying appellant to the robbery in this case is less substantial than the forensic and physical evidence in *Strickler,* the evidence is also significantly less suspicious than the evidence in *Kyles.* As in *Strickler,* the vast majority of the State's evidence in appellant's case would not be directly impeached by the television production company's video of Singh. Further, the value of the impeachment evidence in this case is lower than the value of the impeachment evidence found in *Strickler, Kyles,* and *Lindsey.* We acknowledge that Singh's refusal to pick out appellant's photo prior to trial casts some doubt on his later, in-court identification. The video may even have some impeachment value for Singh's prior, on-scene identification.

But we think the sequence of events is important: Singh initially made an in-person identification of appellant, and only *later* was Singh unable or unwilling to make an identification from a photo spread. In the *Lindsey, Kyles,* and *Strickler* decisions, the eyewitnesses were *first* unable to make an identification (or made impeaching statements related to identification) and only later did they *completely contradict* their earlier statements. The fact that the unsuccessful identification occurred after the positive identification bears on the lesser weight of the impeachment evidence. Further, Singh did not completely contradict the initial on-scene identification. The State correctly notes that Singh never stated during the interview that he could not identify appellant as the robber. Singh even bolstered his prior identification during the interview—he reiterated that he was "so certain" of his positive identification on the day of the crime.

found near the crime scene, and physical and eyewitness testimony that placed the defendant in the victim's car after the murder.

Due to the general persuasiveness of eyewitness testimony, we recognize there is a *possibility* the result of the trial would have been different if counsel had discovered and used the impeachment evidence in this case. But "possibility" is not the standard. When we weigh the totality of evidence against the State's evidence, we are not convinced that there is a reasonable probability—sufficient to undermine our confidence in the verdict—that but for counsel's failure to discover and use the impeachment evidence, the jury would have had a reasonable doubt respecting guilt.

Accordingly, appellant's sole issue is overruled, and the trial court's judgment is affirmed.

*Strickler,* 527 U.S. at 267–69, 293 n. 41, 119 S.Ct. 1936.