

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| EDUARD SORIA, | § | No. 08-20-00074-CR |
| Appellant, | § | Appeal from the |
| v. | § | 205th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20190D00105) |

## **O P I N I O N**

A jury found Appellant Eduard Solis guilty of one count each of aggravated assault with a deadly weapon, taking a weapon from a peace officer, and assault on a peace officer. Appellant contends that (1) the evidence was legally insufficient to support any of the three convictions, (2) that the trial court erred by refusing to provide the jury with an instruction on voluntary conduct, and (3) that the trial court erred by refusing to admit statements the victim of the aggravated assault allegedly made to an investigator from the El Paso County Public Defender's Office before trial. We affirm.[1]

---

[1] The trial court certified Appellant's right to appeal, but the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX.R.APP.P. 25.2(d). The certification is defective, and has not been corrected by Appellant's attorney, or the trial court. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See*

1

# I. BACKGROUND

## A. The Aggravated Assault

The victim of the aggravated assault, Jesus Nassi, testified at trial that he was working as a bar-back at the Cazadores Cantina sports bar on the evening of the assault. According to Nassi, he observed Appellant enter the bar sometime before the assault. Appellant was already inebriated, and the bartender refused to serve him. Appellant was soon asked to leave the bar after he demanded that other bar patrons buy him a drink, and then he went behind the bar and rummaged through a trash can. Francisco Lozano, a bar employee, escorted Appellant out of the bar. Although Lozano at first identified Appellant at trial as being the same person that he escorted from the bar, he later testified on cross-examination that it was "kind of hard" to identify him, as the bar was dark then. Nassi, however, recalled several specific details about Appellant's appearance: he was not wearing a shirt, but had on a torn black hoodie and black sweat pants, and he had tattoos.

Nassi recalled that a short time later, he was standing outside the entrance door of the bar with another employee. He then observed "what looked like" Appellant approach them from behind out of the corner of his eye. Nassi testified that Appellant was holding a metal object in his hand, was breathing hard, and was "moving fast" in his direction. Nassi pushed the other employee to the ground, while unsuccessfully trying to avoid contact with Appellant. Although Nassi did not at first realize what had occurred, he felt a "heavy punch" in his back, and ultimately realized he had been stabbed in the back with a knife. Nassi observed Appellant run away immediately following the stabbing, and the police were then summoned.

---

TEX.R.APP.P. 48.4, 68. Appellant's attorney is further ORDERED, to comply with all of the requirements of TEX.R.APP.P. 48.4.

Lozano testified at trial that although he did not personally witness the stabbing, the other employee who had been with Nassi pointed in the direction in which the assailant had run, and he immediately gave chase. In addition, Lozano recalled that two or three other customers from the bar joined in the chase, and he recalled telling them that he believed they were after Nassi's assailant. At trial, however, he testified that he could not be certain that they were in fact chasing the right person. Lozano recalled that he returned to the bar after running approximately two blocks, while the other individuals continued the pursuit.

## B. The Police Encounter

Various witnesses made 911 calls to the police reporting the stabbing, providing varying descriptions of Nassi's assailant, one of which described the subject as wearing a black shirt and black pants. Two El Paso Police officers, Dionicio Alvarez and Alejandra Serna, were dispatched to the scene. While canvassing the area, they observed three civilian males chasing another shirtless male individual. After stopping to investigate, they heard the three civilians yelling that the individual being chased had committed the stabbing.

The officers observed that the individual, whom they identified at trial as Appellant, was in a fighting stance when they arrived on the scene, was sweating profusely although he was shirtless in the cold weather and was cursing and yelling that he was not the perpetrator. Officer Serna believed that Appellant was holding something in his hand, which she feared might have been the knife involved in the stabbing or some other weapon. Out of concern for their safety, Officer Serna first drew her service weapon, and Officer Alvarez took out his standard issue taser.

Both officers, who were in full police uniforms and identified themselves as police officers, commanded Appellant to get to the ground and to put his hands up. When Appellant ignored their commands, Officer Alvarez kicked him to the ground. The officers thereafter attempted to

3

handcuff Appellant and place him in custody to investigate his role in the stabbing, but they could not subdue him; instead, Appellant continually fought and struggled with them, pushing and hitting them, "kicking a lot," and "throwing [them] off." Another witness who lived in the neighborhood testified that the officers were "struggling" with Appellant and appeared to have had a difficult time subduing him.

Officer Serna testified that she first used her taser on Appellant to subdue him, but it appeared to have no effect. In fact, Appellant pulled out the taser prongs from his torso and continued to struggle with the officers.[2] Thereafter, Officer Alvarez used his taser to "drive stun" Appellant, by placing the taser against Appellant's skin, but again this appeared to have no effect, and Appellant continued to struggle with the officers. During the struggle, Appellant took the taser from the officer's hand. Officer Alvarez testified that while the two were struggling over the taser, Appellant kicked him in the leg, causing him pain. Officer Alvarez subsequently kicked the taser out of Appellant's hand, and after retrieving it, Officer Alvarez once again tased Appellant, but once again, this appeared to have no effect on him. Officers Alvarez and Serna, as well as two officers who later arrived on the scene, testified that they could smell alcohol on Appellant's breath. They speculated that Appellant might have been under the influence of an unknown drug, as he appeared to be "hyped up" and was exhibiting "super strength" in his ability to withstand the tasing.

As they failed to get control of Appellant, the officers sought help from the three civilians who were still at the scene, and they held Appellant down while the officers placed him in handcuffs. Despite being placed in handcuffs, however, Appellant continued to struggle with the

---

[2] The officers testified that in their experience it is very unusual for a person to remove taser prongs from their body, as it is painful to do so and that typically EMS personnel are summoned to do so.

4

officers. As many as 14 other officers ultimately arrived on the scene to assist in Appellant's arrest, and two of those officers testified that Appellant was still struggling to get up when they arrived on the scene.[3] One officer testified that Appellant was yelling and screaming that he was a member of a gang affiliated with the Barrio Azteca gang, and that they had "better let [him] go."

After Officer Alvarez informed the newly arrived officers that Appellant had kicked him, photographs were taken of his pants to document that they had dirt and dust on them where he had been kicked. Although both Officers Alvarez and Serna looked as if they had been in a struggle, and Officer Alvarez appeared visibly upset, neither one suffered any other physical injuries.

Appellant was thereafter taken to the hospital for medical clearance. At the hospital, Appellant had to be sedated and handcuffed to his bed, as was continuing to try to get up as well as attempting to spit on the officers in his hospital room. Photographs taken of him at the hospital showed that he had blood on his right hand, though the blood was not swabbed. After Appellant was taken to the hospital, Officers Alvarez and Serna combed the area, and found a black shirt nearby, with a large construction nail underneath it, which Officer Serna surmised Appellant may have been holding when she and Officer Alvarez first arrived on the scene.

## C. Court Proceedings

The State filed a three-count indictment against Appellant, alleging that he committed: aggravated assault with a deadly weapon on Nassi; (2) taking a weapon from a peace officer with the intent to harm him; and (3) assault on a peace officer. At the close of the State's case, Appellant moved for a directed verdict on all three charges, contending, as he does on appeal, that

---

[3] The newly arrived officers recorded this portion of the struggle on one of their vehicle's dash-cam which was introduced into evidence at trial. The video shows that Appellant was continuing to struggle when the other officers arrived on the scene. The dash-cam in the vehicle being driven by Officers Alvarez and Serna was not on at the time of their initial encounter with Appellant, and no video recording of the initial encounter was introduced into evidence at trial.

5

there was insufficient evidence to support a verdict on any of the charges. The trial court denied all three motions.

In addition, as explained below, Appellant requested a "voluntary conduct" instruction for the assault on Officer Alvarez, claiming that the evidence supported a finding that he had lost muscle control due to being repeatedly tased. Appellant reasons this fact would have allowed the jury to find him not guilty of kicking Officer Alvarez in a voluntary manner as was necessary to support a conviction. The trial court denied the request, concluding that it would constitute an improper comment on the evidence. However, the trial court allowed Appellant's attorney to argue the issue to the jury, and defense counsel did in fact repeatedly argue that the jury should find him not guilty on this basis.

The jury found Appellant guilty of all three counts, and the trial court sentenced Appellant to 30 years in prison for each count, with all three sentences to run concurrently.[4] This appeal followed.

## II. ISSUES ON APPEAL

Appellant raises three issues on appeal: (1) whether the trial court erred by refusing to admit two prior statements that the stabbing victim made to an investigator from the Public Defender's Office, which Appellant believes were supportive of his defense of mistaken identity; (2) whether the trial court erred by refusing to give his requested instruction to the jury on voluntary conduct related to the assault on Officer Alvarez; and (3) whether there was sufficient evidence to support his conviction on all three counts in the indictment. We start in reverse order,

---

[4] The State admitting three earlier convictions in the punishment phase of the trial: a 2018 Theft of Property conviction, a 2010 Escape While Arrested conviction, and a 2000 Aggravated Assault conviction.

with Appellant's sufficiency of the evidence claims, and then consider his remaining two arguments.

## III. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

The constitutional guarantee of due process requires that every conviction be supported by legally sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). In a legal sufficiency challenge, we focus solely on whether the evidence, when viewed in the light most favorable to the verdict, would permit *any* rational jury to find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19; *Brooks*, 323 S.W.3d at 912 (recognizing legal sufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

Applying that standard, we recognize that our system designates the jury as the sole arbiter of the credibility and the weight attached to the testimony of each witness. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex.Crim.App. 2020); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). Only the jury acts "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319. In doing so, the jury remains at liberty to believe "all, some, or none of a witness's testimony." *Metcalf*, 597 S.W.3d at 855. When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319.

In conducting our review, we also keep in mind that circumstantial evidence is just as probative as direct evidence in establishing guilt, and that circumstantial evidence alone may be

7

sufficient to sustain a conviction. *Dobbs*, 434 S.W.3d at 170. Each fact need not point directly and independently to the guilt of the defendant, so long as the cumulative force of all the incriminating circumstances can support the conviction. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

We also remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson.*" *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). Yet "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App. 1988). Instead, our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010).

The sufficiency of the evidence is measured by comparing the evidence produced at trial to "the essential elements of the offense as defined by the hypothetically correct jury charge." *Metcalf v. State*, 597 S.W.3d at 856, *quoting Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997) (internal quotation marks omitted). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id., quoting Malik*, 953 S.W.2d at 240.

## B. Aggravated Assault with a Deadly Weapon

The elements of the offense of aggravated assault with a deadly weapon, as alleged in Count One in the indictment, are that (1) Appellant (2) intentionally, knowingly, or recklessly (3)

8

caused bodily injury to Nassi (4) with the use of a deadly weapon—a knife. *See* TEX.PENAL CODE ANN. § 22.01(a)(1) (a person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another); TEX.PENAL CODE ANN. § 22.02(a) (a person commits the offense of aggravated assault if the person commits assault as defined in section 22.01 and the person causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault). Appellant challenges only the first element of the offense, contending that there was legally insufficient evidence identifying him as Nassi's assailant. Identity is an essential element of any crime, and the State must establish the identity of the defendant as the perpetrator of an offense beyond a reasonable doubt. *See Miller v. State*, 667 S.W.2d 773, 775 (Tex.Crim.App. 1984); *In re D.R.T.*, 339 S.W.3d 208, 210 (Tex.App.--El Paso 2011, no pet.). That said, we disagree with Appellant's argument that the record contains insufficient evidence to support the jury's finding that he was Nassi's assailant.

Appellant's sufficiency argument is mainly based on what he believes are discrepancies in the testimony on his identity as the assailant. He focuses on the several 911 callers who provided varying descriptions of the assailant. Lozano, the bar's security employee, did not witness the stabbing and was less than certain when he identified Appellant as the person he had seen in the bar earlier that evening. And although Nassi positively identified Appellant at trial as his assailant, he had expressed some uncertainty regarding his ability to identify his assailant to the Public Defender's investigator, an issue we discuss below.[5] Discrepancies or conflicts in the

---

[5] Appellant also points out, as the State admitted at trial, that the police conducted a less than thorough investigation of the stabbing, noting that they did not take written statements from any of the bar's patrons, including the three individuals who chased him, and further collected no DNA or fingerprints from the knife that could have established the identity of Nassi's assailant. However, the fact that the police could have, but did not, collect more evidence to support an accused's guilt does not, standing alone, render the evidence insufficient. *See Harmon v. State*, 167 S.W.3d 610, 614 (Tex.App.--Houston [14th Dist.] 2005, pet. ref'd) (where victim identified defendant in court, a rational jury could have found him guilty of aggravated robbery without DNA, fingerprint, or other evidence of the gun or cash that defendant took from his victim), *citing Santos v. State,* 116 S.W.3d 447, 459 (Tex.App.--Houston [14th Dist.] 2003, pet. ref'd) (rejecting argument that lack of fingerprints connecting appellant to robbery rendered

evidence about Appellant's identity does not render the evidence insufficient, as Nassi's in-court identification of Appellant as his assailant was, by itself, sufficient to establish his guilt. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex.Crim.App. 1971) (concluding that the testimony of an eyewitness alone was sufficient to support the jury's verdict.); *Sandoval v. State*, No. 08-11-00283-CR, 2013 WL 5873296, at *14-15 (Tex.App.--El Paso Oct. 30, 2013, pet. ref'd) (not designated for publication) (victim's in-court identification of defendant as perpetrator of aggravated robbery was legally sufficient to support a conviction).

Nassi not only positively identified Appellant as his assailant at trial, but he also identified Appellant from a photo lineup that the Public Defender's investigator showed him before trial. The jury was the sole judge of Nassi's credibility and the weight to be given his testimony, and was free to resolve any inconsistencies in Nassi's testimony—or in the other evidence presented at trial—in determining whether the State proved Appellant's identity as the perpetrator beyond a reasonable doubt. *See Azzam v. State*, No. 08-17-00137-CR, 2019 WL 457608, at *3 (Tex.App.--El Paso Feb. 6, 2019, no pet.) (not designated for publication) (victim's testimony could support the jury's verdict, despite inconsistencies in victim's testimony and the existence of conflicting evidence); *Mauldin v. State*, No. 08-09-00028-CR, 2010 WL 4523761, at *3 (Tex.App.--El Paso Nov. 10, 2010, pet. ref'd) (not designated for publication) (where victim testified about defendant's identity, jury's verdict was conclusive despite conflicting testimony from other witnesses because the jury was the sole judge of the witnesses' credibility and the weight attributed to their testimony).

Moreover, there was additional circumstantial evidence from which the jury could have reasonably inferred that Appellant was Nassi's assailant. Appellant had been ejected from the bar

---

evidence insufficient to support conviction).

10

shortly before the stabbing, and the jury could have inferred that not only was he in the general area at the time of the stabbing but that he had the opportunity and the motive to commit the offense. *See Merritt v. State*, 368 S.W.3d 516, 526 (Tex.Crim.App. 2012) (recognizing that motive and opportunity can be circumstantial evidence that the defendant was the person who committed an offense). In addition, when Officers Alvarez and Serna responded to the 911 call for the stabbing, they observed Appellant being chased by the three civilians who were shouting that Appellant was the individual who stabbed Nassi. And finally, the record reflects that Appellant was later photographed in the hospital with blood on his hand.

As a result, viewing the combined and cumulative force of both the direct and circumstantial evidence presented at trial, and viewing that evidence in the light most favorable to the jury's verdict, we conclude that there was legally sufficient evidence to support the jury's verdict of aggravated assault with a deadly weapon.

### C. The Offense of Taking a Weapon from a Peace Officer

At the time Appellant was charged, the elements of the offense of taking a weapon from a peace officer, as alleged in Count Two in the indictment, were that (1) Appellant (2) intentionally or knowingly (3) with force (4) took Officer Alvarez's taser (5) intending to harm Officer Alvarez. Act of June 17, 2011, 82nd Leg., R.S., ch. 839, § 5, 2011 TEX.GEN.LAWS 2110 (amended 2019) (current version at TEX.PENAL CODE ANN. § 38.04). [6] Appellant does not deny that he intentionally or knowingly took Officer Alvarez's taser, or that he did so by force. But he denies

---

[6] This offense was committed on January 8, 2019. The Penal Code was amended, effective September 1, 2019, to omit the requirement that the defendant acted with the "intent to harm" the officer. *See* Act of May 22, 2019, 86th Leg., R.S., ch. 647, § 1, 2019 TEX.GEN.LAWS 1893 ch. 647 (current version at TEX.PENAL CODE ANN. § 38.14(b)) (a person "commits an offense if the person intentionally or knowingly and with force takes or attempts to take from a peace officer . . . the officer's . . . firearm, nightstick, stun gun, or personal protection chemical dispensing device"). This case, therefore, is governed by the prior version of the statute.

11

that there was any evidence to support a finding that he took the taser with the intent to harm Officer Alvarez.[7]   And in fact, he argues that the only evidence of his intent established that he took the taser with the intent to protect himself, rather than to harm the officer.   He points out that on cross-examination, Officer Alvarez agreed with the statement that Appellant took the taser away from him to stop the officer from continuing to stun him.[8]   This single answer by Officer Alvarez, however, does not preclude a finding that Appellant acted with the requisite intent to harm the officers.

First, although Officer Alvarez testified that he believed Appellant may have been trying to protect himself when he took the taser, he did not testify that he believed this was Appellant's *only* intent in doing so.   Appellant may have had more than one intent in taking the taser—he may have taken the taser not only to protect himself, but also with the intent to harm Officer Alvarez, and would have done so if the officer had not regained possession of the taser in time.   *See Barnes v. State*, No. 14-05-00144-CR, 2006 WL 2548186, at *7-8 (Tex.App.--Houston [14th Dist.] Sept. 5, 2006, pet. ref'd) (mem. op., not designated for publication) (recognizing that jury could reasonably infer that defendant took officer's weapon during a struggle with the intent to harm the officer, despite evidence that defendant expressed the intent to harm himself as well).   We thus do not find Officer Alvarez's testimony disposes of the issue of Appellant's intent.

Moreover, the lack of direct testimony that Appellant intended to harm Officer Alvarez

---

[7] The Penal Code also provides that it is a "defense to prosecution under this section that the defendant took or attempted to take the weapon from a peace officer, . . . who was using force against the defendant or another in excess of the amount of force permitted by law." TEX.PENAL CODE ANN. § 38.14(d).   Appellant, however, did not raise this defense at trial and does not contend that the officers used excessive force against him.

[8] The officer testified on cross-examination as follows:

[Defense Counsel]:   Okay.   And also when he's grabbing that taser from you, what he's trying to do is keep you from using it on him. Right?

[Officer Alvarez]:   Correct.

12

would not preclude a jury from reasonably inferring intent from the circumstances of the offense. There is seldom direct evidence of a defendant's intent in committing an offense, and therefore, "a culpable mental state must generally be inferred from the circumstances" surrounding the offense. *See Romano v. State*, 610 S.W.3d 30, 35 (Tex.Crim.App. 2020). Thus, a jury may infer a defendant's intent by considering the defendant's acts, words, and conduct before, during, and after the offense. *See Zavala v. State*, No. 08-17-00136-CR, 2019 WL 2241669, at *4 (Tex.App.--El Paso May 24, 2019, pet. ref'd) (not designated for publication) (a defendant's culpable mental state is generally proven by circumstantial evidence, and the jury may consider events before, during, and after the commission of the offense); *see also Knight v. State*, 457 S.W.3d 192, 199 (Tex.App.--El Paso 2015, pet. ref'd) (same). As the Court of Criminal Appeals has explained, a court "cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words and conduct." *Romano*, 610 S.W.3d at 35.

Here, the circumstantial evidence showed that Appellant was engaged in a prolonged physical struggle with the officers and was hitting and kicking them in an apparent attempt to avoid being taken into custody. *See generally Fenderson v. State*, Nos. 03-20-00161-CR, 03-20-00162-CR, 2021 WL 2231925, at *2-4 (Tex.App.--Austin June 3, 2021, no pet.) (mem.op., not designated for publication) (jury could have reasonably inferred from circumstances of the case that defendant intentionally or knowingly took peace officers' taser, where he gained possession of it while fighting the officers and resisting arrest, and where officer had to forcefully take it away from him); *Olivarez v. State*, No. 07-09-00223-CR, 2010 WL 2756917, at *6 (Tex.App.-- Amarillo July 13, 2010, no pet.) (mem. op., not designated for publication) (jury could have reasonably concluded that defendant intentionally or knowingly took officer's taser where he was in a physical struggle with officer and was attempting to avoid arrest at the time). It took two officers and

13

several civilians to subdue Appellant. And he had to be sedated and handcuffed to his gurney at the hospital because of his continued resistance and attempts to spit at the officers.

Although the record contained conflicting evidence of Appellant's intent in taking the taser—as with any other element of an offense—we must presume that the jury resolved those conflicts in favor of the verdict and defer to that determination. *Merritt*, 368 S.W.3d at 525-26. We therefore conclude that there was legally sufficient evidence to support Appellant's conviction for taking the taser from Officer Alvarez with the intent to harm him.

### D. The Offense of Assault on a Peace Officer

The elements of the offense of Assault on a Peace Officer, as alleged in Count Three in the Indictment, are that (1) Appellant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to Officer Alvarez by kicking Officer Alvarez's leg (4) knowing that Officer Alvarez was a public servant (5) while Officer Alvarez was discharging his official duties by attempting to arrest or detain Appellant. *See* TEX.PENAL CODE ANN. § 22.01(b-2). Appellant challenges only the intent element, arguing that there was insufficient evidence as a matter of law to establish that he acted either voluntarily or intentionally in assaulting Officer Alvarez. He claims that while being tased during the police encounter, he would be unable to physically control his movements.

Generally, a defendant only commits an offense if he voluntarily engages in the conduct alleged to be criminal. *See Rogers v. State*, 105 S.W.3d 630, 639 (Tex.Crim.App. 2003) (recognizing that before criminal responsibility may be imposed, the actor's conduct must "include[ ] either a voluntary act or an omission when the defendant was capable of action."); *see also* TEX.PENAL CODE ANN. § 6.01(a) ("A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession"). And body movements are not voluntary if they are "the nonvolitional result of someone else's act, are set in motion by some

14

independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus[.]" *Rogers*, 105 S.W.3d at 638. Yet the question of whether a defendant has acted in a voluntary manner is a "low threshold," and even "accidental or unintentional movements and actions are voluntary." *Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex.Crim.App. 2021), *citing Rogers*, 105 S.W.3d at 638-39. Thus, only if an outside force directly causes the movement, or if the movement results from truly nonvolitional action such as a muscle spasm, will an action be treated as involuntary. *Id.*

Appellant argues that the evidence established as a matter of law that he did not act voluntarily when he kicked Officer Alvarez, as the undisputed evidence demonstrated that he had been repeatedly tased during his struggle with the officers, which he claims caused him to lose control of his muscle functions. True enough, officers Alvarez and Serna repeatedly used their tasers on him during the police encounter. However, the record does not contain undisputed evidence that the taser caused Appellant to lose control of his muscles. To the contrary, the record shows the opposite—that he maintained control of his physical abilities throughout his struggle with the officers.[9]

While it is true that the officer testified at trial that tasing *in general* can cause a person to lose muscle control, essentially causing the person's muscles to be "deactivate[d]" or "incapacitate[d]," they also testified that the tasing here appeared to have no effect on Appellant.

---

[9] Our sister courts have found that when a defendant has started a physical struggle with an officer in which the officer is injured, the accused cannot rely on the defense that the officer was injured as the result of an involuntary movement occurring during the struggle because the action of initiating the struggle is enough to render the accused's actions voluntary. *See, e.g.*, *Rollins v. State*, No. 01-14-00768-CR, 2016 WL 635218, at *9 (Tex.App.--Houston [1st Dist.] Feb. 11, 2016, no pet.) (mem. op., not designated for publication) (where defendant struggled with officer to resist arrest, his conduct was voluntary, even though the officer may have been injured by the defendant's involuntary actions that occurred during the struggle); *Cruz v. State*, 838 S.W.2d 682, 686 (Tex.App.--Houston [14th Dist.] 1992, pet. ref'd) (where prison inmate engaged in a physical struggle with prison guards, and fell on top of an officer, which dislocated the officer's shoulder, he committed the required voluntary act by instigating the altercation). That argument is not raised by the parties here, and we express no opinion on whether or how it would apply to these facts.

15

Appellant was not only able to take the taser prongs from his body, but was even able to take a taser away from Officer Alvarez in the midst of their attempts to subdue him. Standing alone, this evidence was sufficient to allow the jury to reject Appellant's claim that he had lost control of his muscular functions due to the tasing, and to reject his claim that he acted involuntarily in kicking Officer Alvarez. *See, e.g.*, *Hale v. State*, No. 03-12-00810-CR, 2013 WL 4822954, at *4 (Tex.App.--Austin Aug. 30, 2013, no pet.) (mem. op., not designated for publication) (where officers testified that tasing of defendant was ineffective and failed to subdue him, the jury was free to reject defendant's claim that he acted involuntary when he bit one of the officers during their ongoing struggle); *see also Olivarez*, 2010 WL 2756917, at *4 (the jury could have reasonably rejected defendant's theory that he suffered involuntary muscle contractions resulting from being drive-stunned by officer's taser, where he gained possession of officer's taser during their struggle).

And finally, we find that the jury could have reasonably inferred that Appellant harbored the requisite mental state when he kicked Officer Alvarez. As discussed above, the evidence established that Appellant was fighting with the officers throughout the police encounter, both before and after being tased, and was refusing to be subdued despite their best efforts. Therefore, the jury could have reasonably inferred that Appellant kicked Officer Alvarez during this melee with the intent to cause him bodily harm, or that at the least, he committed the act in a knowing or reckless manner. We therefore conclude that there was legally sufficient evidence to support Appellant's conviction for assault on a peace officer.

Appellant's Issue Three is overruled.

## IV. THE JURY CHARGE

In Issue Two, Appellant argues that the trial court erred in refusing to provide the jury with his requested "voluntariness" instruction, which would have informed the jury that a person commits an offense only if he voluntarily engages in the conduct that is made criminal, and that he therefore could not be convicted of assaulting Officer Alvarez if the jury found that his actions were involuntary.[10]  For the reasons noted below, we conclude that even if the trial court erred by failing to give the jury a voluntary conduct instruction, any such error did not harm Appellant's case.

### A. Applicable Law

The trial court must provide the jury with a written charge distinctly setting forth the law applicable to the case.  *See Maciel v. State*, 631 S.W.3d 720, 722 (Tex.Crim.App. 2021).  The Court of Criminal Appeals has recognized that a "judge must give a requested instruction on every defensive issue raised by the evidence without regard to its source or strength, even if the evidence is contradicted or is not credible."  *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex.Crim.App. 2013); *Jordan v. State*, 593 S.W.3d 340, 343 (Tex.Crim.App. 2020) (a defensive instruction must be given "[r]egardless of the strength or credibility of the evidence," as long as there is some evidence in the record to support it).  In general, the defendant bears the burden of producing some evidence that raises the defense.  *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex.Crim.App.

---

[10] The relevant portion of the application charge language that Appellant requested reads as follows:

> You are instructed that a person commits an offense only if he voluntarily engages in conduct, including an act, omission, or possession. Conduct is not rendered involuntary because the person did not intend the results of his conduct.

> Therefore, if you believe from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Eduard Soria, did cause the injury of Dionicio Alvarez by kicking Dionicio Alvarez as alleged in the indictment, but you further believe from the evidence, or you have a reasonable doubt thereof, that the injury was a result of an accident and was not the voluntary act of conduct of the defendant, you will acquit the defendant and say by your verdict "Not Guilty."

17

2003); *see also* TEX.PENAL CODE ANN. § 2.03(c) (the "issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense").  But when reviewing a trial court's ruling denying a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested instruction.  *Rodriguez*, 629 S.W.3d at 231 (whether the evidence supports a requested defensive instruction is viewed in the light most favorable to the requested instruction).

While a defendant's mental state is an element of the offense that the State must prove, voluntariness is a defensive issue which must be raised by the evidence before a voluntariness instruction is warranted.  *Brown v. State*, 955 S.W.2d 276, 279-280 (Tex.Crim.App. 1997).  But when the evidence raises voluntariness of a defendant's conduct, the jury must be charged, when requested, on that issue.  *Id.* at 280; *see also Payne v. State*, 33 S.W.3d 374, 376 (Tex.App.--Houston [1st Dist.] 2000, pet. ref'd) (trial court erred by refusing to give an involuntary-conduct instruction where two witnesses testified that victim was shot when she tried to slap away a gun the defendant was holding, causing it to discharge).

## B.  Whether Sufficient Evidence Supported a Voluntary Conduct Instruction

The jury heard evidence that Appellant was repeatedly tased, and that the taser is intended to incapacitate a person's control over their muscle movements.  From this, Appellant contends the jury should have been instructed on the effect of involuntary movements.

The State responds that the evidence did not support the instruction for these two reasons: (1) Appellant did not testify at trial and therefore did not "admit" that he kicked the officer, and (2) the evidence about the effects of tasing was theoretical at best, and did not establish that Appellant did in fact lose muscle control here.  As for its first argument, a defendant need not testify to be entitled to a defensive instruction if the evidence otherwise supports the defensive

18

theory.   The Court of Criminal Appeals has repeatedly held, "a defense is supported (or raised) by the evidence if there is some evidence, *from any source*, on each element of the defense that, if believed by the jury, would support a rational inference that the element is true."   *Shaw v. State*, 243 S.W.3d 647, 657-58 (Tex.Crim.App. 2007) (emphasis supplied); *see also Lozano v. State*, 636 S.W.3d 25, 33 (Tex.Crim.App. 2021) (evidence of self-defense need not come from the defendant and can instead be raised by other witnesses' testimony about the defendant's acts and words at the time of the offense).   Officer Alvarez testified that Appellant kicked him, and Appellant never disputed that fact; instead, his defense counsel repeatedly argued to the jury that the kicking occurred in an involuntary matter.   We find this sufficient to establish that Appellant conceded that the act occurred.   *See generally Rogers*, 105 S.W.3d at 639 n.30 ("When a person claims the involuntary-act defense he is conceding that his own body made the motion but denies responsibility for it.") (citations omitted); *Phillips v. State*, No. 08-19-00167-CR, 2020 WL 7022657, at *3 (Tex.App.--El Paso Nov. 30, 2020, no pet.) (not designated for publication) (same).[11]

The State's second argument is that the testimony of the effects of a taser was only theoretical, and not specific to Appellant.   For instance, Officer Serna testified on cross-examination:

> [Defense Counsel]: And throughout this period of time, your muscle function is effected by the taser --
>
> [Officer Serna]: Yes.
>
> [Defense Counsel]: -- and you're not really in control of your muscle reactions at that point?

---

[11] We contrast this with situations in which the defendant has expressly denied committing an act, which may render the defendant ineligible to receive the instruction.   *See Trujillo v. State*, 227 S.W.3d 164, 169-70 (Tex.App.--Houston [1st Dist.] 2006, pet. ref'd) (where defendant denied at trial that he committed the act of pulling the trigger of gun that killed his victim, he was not entitled to an instruction on involuntary conduct).   Here, no such denial occurred.

[Officer Serna]: Correct.

We need not reach the issue of whether the testimony needed to be general, or specific to Appellant, as we find that any error in refusing to give the instruction was harmless.

### C. Whether Appellant was Harmed by the Failure to Give the Instruction

When analyzing a jury charge issue, an appellate court uses a two-pronged test and first determines whether there was error and, if so, it must then determine whether the error caused sufficient harm to warrant a reversal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on reh'g); *see also Torres v. State*, 543 S.W.3d 404, 414 (Tex.App.--El Paso 2018, pet. ref'd), *citing Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). The amount of harm necessary to warrant a reversal depends on whether the appellant objected to the jury charge, thereby preserving the error. *See Torres*, 543 S.W.3d at 414, *citing Almanza*, 686 S.W.2d at 171. If charge error was preserved, we review for "some harm," but we review unpreserved error for egregious harm. *Id.* Because Appellant requested a voluntary conduct instruction, we review the trial court's error in refusing to give the instruction for "some harm."

In assessing "some" harm under *Almanza*, an appellate court should consider four factors: (1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) any other relevant information as revealed by the record as a whole. *French v. State*, 563 S.W.3d 228, 235-36 (Tex.Crim.App. 2018), *citing Almanza*, 686 S.W.2d at 171. And although this is a less exacting standard than the egregious harm standard we apply when jury charge error has not been preserved, the "standard of 'some' harm still requires that the record reveal 'actual,' and not merely 'theoretical' harm." *Id.* at 235; *see also Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex.Crim.App. 2020) (same). Thus, when "a record reveals a risk of harm that is so small that it may properly be characterized as not 'remotely significant,' or where the risk of harm is "almost infinitesimal,'

20

any harm resulting from the error is only theoretical harm." *French*, 563 S.W.3d at 239 (citations omitted).

### 1. *Factor one: the entirety of the jury charge*

In considering the first factor—the entirety of the jury charge—the State focuses on the instruction of the requisite mental states necessary to convict Appellant of the assault on Officer Alvarez. That instruction informed the jury that a person acts intentionally as to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. The State argues that the jury charge already required the jury to find that Appellant acted in a voluntary manner in kicking Officer Alvarez—with a conscious objective or desire to do so. But the "issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Brown*, 955 S.W.2d at 280. The jury was also informed that it could convict Appellant of the assault on Officer Alvarez based solely on a finding that he acted "knowingly" as for the nature of his conduct, which only required a finding that Appellant was "aware of the nature of his conduct" and was "aware that his conduct [was] reasonably certain to cause the result." It is possible to imagine a scenario in which a person has lost control of his bodily movements, but may still be mentally aware of the movements. In other words, it is at least theoretically possible that Appellant may have been mentally "aware" that he was kicking Officer Alvarez, but might still have been unable to control his actions at that time due to being tased. Accordingly, we do not believe that the jury charge fully informed the jury of the need to find that Appellant's actions were voluntary, and therefore the entirety of the jury charge favors a finding of harm.

### 2. *Factor two: the state of the evidence*

We reach a different result as for the second factor, as we find that the state of the evidence bodes against a finding of harm. As summarized above, although the evidence at trial suggested

that a person could theoretically become incapacitated from being repeatedly tased, there was no evidence that the tasing did in fact have this effect on Appellant. To the contrary, the overwhelming evidence suggested that Appellant was not affected by the tasing. Moreover, as was also discussed above, the evidence established that Appellant was acting aggressively towards the officers from the start of their encounter, and was physically struggling against them before, during, and after the tasing began. Accordingly, we find little, if any, evidence to support a finding that Appellant had lost control of his muscle functions due to the tasing, or that his action in kicking Officer Alvarez was otherwise involuntary. We therefore conclude that this factor weighs heavily against a finding of harm.

### 3. Factor three: the jury arguments

We also conclude that the third factor, the nature of the jury arguments, weighs against a finding of harm. As discussed above, although the trial court denied Appellant's request to give an involuntary-conduct instruction, the court expressly allowed defense counsel to argue to the jury that Appellant kicked Officer Alvarez involuntarily as the result of being tased. And defense counsel exploited this opportunity, repeatedly encouraging the jury during closing argument to acquit Appellant of the assault on that basis.[12] That the jury found Appellant guilty of the offense, despite defense counsel's repeated arguments that Appellant's conduct was involuntary, suggests that the jury simply did not believe Appellant's defense. We therefore conclude that this factor therefore weighs heavily against a finding of harm.

---

[12] We note that the trial court gave defense counsel wide latitude to make that argument, overruling the State's objection that there was no medical testimony to support defense counsel's claim that the tasing caused "neuromuscular incapacitation," which he characterized as being "strong, involuntary, long muscle contractions." In addition, defense counsel argued—without objection—that the officers had testified that Appellant had lost all voluntary use of his body, when in fact, as the State's attorney pointed out during closing arguments, the officers only testified at trial to the theoretical effects of being tased.

Finding no other relevant factors, we conclude that the risk of harm from the trial court's refusal to give a voluntary conduct instruction was so small that it may properly be characterized as not "remotely significant," or even "infinitesimal," such that any harm resulting from the failure to give the instruction was at most only "theoretical harm." *French*, 563 S.W.3d at 239.

Appellant's Issue Two is overruled.

## V.  NASSI'S PRIOR STATEMENTS

In Issue One, Appellant contends that the trial court erred by excluding prior inconsistent statements from the victim.   Those statements arise from an interview of Nassi by Yolanda Juarez, an investigator from the El Paso Public Defender's Office.   The statements can be broken into two categories, which we address separately as they involve different considerations.

### A.  Statements About Appellant's Identity

First, Appellant contends that Nassi made statements to Juarez during the interview suggesting that he was uncertain if he could identify his assailant.   Appellant contends that these statements were inconsistent with his trial testimony in which he unequivocally identified Appellant as his assailant, and were therefore admissible under Rule 613 of the Texas Rules of Evidence.   He also contends that the trial court's decision to exclude the statements deprived him of his constitutional right to present his defense of mistaken identity, and further violated his Sixth Amendment right to confront witnesses.   We conclude, however, that the trial court did not abuse its discretion in excluding the statements under the rules of evidence, any error in excluding the prior statements was not of a constitutional nature, and was instead at most an evidentiary error harmless to Appellant's case.

23

### 1. Rule 613 of the Texas Rules of Evidence

Assuming a proper foundation has been laid, Rule 613 permits a party to impeach a witness with any prior inconsistent statements that conflict with their trial testimony. *See Ex parte Saenz*, 491 S.W.3d 819, 827 (Tex.Crim.App. 2016) *citing* TEX.R.EVID. 613(a). The most fundamental foundational requirement is that the prior statement and the witnesses' trial testimony are inconsistent with each other.[13] *See Lopez v. State*, 86 S.W.3d 228, 230 (Tex.Crim.App. 2002) (to qualify for admission under Rule 613(a), the court must first "be persuaded that the statements are indeed inconsistent"); *see also Wisenbaker v. State*, No. 08-19-00034-CR, 2020 WL 6867067, at *4 (Tex.App.--El Paso Nov. 23, 2020, no pet.) (not designated for publication) (to be admissible under Rule 613, a "prior statement must actually be inconsistent with the witness's trial testimony"). It is generally within the trial court's discretion to make that determination, and as long as the judge's ruling is "within the zone of reasonable disagreement, we will not intercede." *Lopez*, 86 S.W.3d at 230.

### 2. The claimed conflicts in the testimony

Nassi testified in the State's case on direct examination that:

- He saw Appellant come into the bar, bother the patrons, and Appellant was asked to leave and did.
- Soon after, as Nassi was showing another employee how the front door locked, Nassi saw someone come to his right side, out of the corner of his eye who "looked like the guy that was in there -- that had just gotten escorted out."
- Nassi made an in-court identification of Appellant as the person who stabbed him.

---

[13] The Rule also provides that the following foundational requirements must be met before a prior inconsistent statement will be admitted: "When examining a witness about the witness's prior inconsistent statement--whether oral or written--a party must first tell the witness: (A) the contents of the statement; (B) the time and place of the statement; and (C) the person to whom the witness made the statement." TEX.R.EVID. 613(a)(1). The witness must then be given the opportunity to explain or deny the prior inconsistent statement. *Id.* at 613(a)(3). And finally, the Rule provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement." *Id.* at 613(a)(4); *see also Straker v. State*, No. 08-14-00112-CR, 2016 WL 5845825, at *20 (Tex.App.--El Paso Sept. 30, 2016, no pet.) (not designated for publication) (discussing foundational requirements under Rule 613).

24

On cross-examination, Nassi was asked about his interview with Juarez. First he

described some manner of photo line-up that she showed him:

> DEFENSE COUNSEL: And so you both sat down and started to discuss the events
> of the night of January 8th. Is that correct?
>
> NASSI: No, we didn't discuss nothing. She asked me to identify the suspect.
>
> DEFENSE COUNSEL: Do you remember talking to her about giving her a
> description of the individual that was there that night?
>
> NASSI: By picture only.
> . . .
> DEFENSE COUNSEL: All right. Do you remember telling her that this individual
> had a C-like shaped tattoo in the middle of his chest as well as teardrop tattoos
> running down his eye? Do you remember telling her that?
>
> NASSI: Once I saw -- identified the picture.
>
> DEFENSE COUNSEL: But did you tell her that individual that you saw that night
> had tattoos running down his eye, teardrop tattoos?
>
> NASSI: With his picture, yes.
>
> DEFENSE COUNSEL: Okay. But's that's not your recollection of the -- but
> that's what you told her, that was the individual from the picture?
>
> NASSI: Yes, sir. From the picture, yes.
> . . .
> DEFENSE COUNSEL: In this photograph that you keep talking about, you said
> that that person looked like the attacker, but you were still not completely sure at
> that time?
>
> NASSI: Yes.

As to this line of questioning, Appellant wanted to offer Juarez to testify to the following which

was developed outside the presence of the jury:

> DEFENSE COUNSEL: And did he -- was he able to recognize -- did he tell you
> that he was able to recognize the assailant?
>
> JUAREZ: He said he wasn't sure.
>
> DEFENSE COUNSEL: And that's your recollection on this?

JUAREZ: That is correct.

DEFENSE COUNSEL: At that point, did you at some point show him a photo lineup?

JUAREZ: Yes, I did.

DEFENSE COUNSEL: And was he able to identify the individual -- any individual in that case as the assailant?

JUAREZ: He was -- he initialed on Eduardo Soria's picture, but he did have a hard time making a choice and very apprehensive.

DEFENSE COUNSEL: Okay.   Did you ask him to sign the picture?

JUAREZ: I did.

DEFENSE COUNSEL: Would he sign it?

NASSI: No, he would not.

The photos used in the "line-up" were not shown to Nassi at trial and are not a part of our record.

In Appellant's cross-examination of Nassi, he was also asked if he told Juarez that he was unsure of Appellant's identity.   But as the questioning revealed, there was some apparent confusion about whether Nassi was saying he had doubts about identifying Appellant, or whether he was saying he did not know Appellant:

DEFENSE COUNSEL: Okay.   Going back to the interview with the investigator from the Public Defender's Office back in March of '98 -- excuse me, of 2019 . . . At that time, did you tell her that you were not sure of the identity of the person who had just struck you?

NASSI:   No, sir.

DEFENSE COUNSEL:   You knew at that time who had struck you?

NASSI:   I had remembered, yes.   I didn't know him, I remember the person.

DEFENSE COUNSEL:   I'm not sure I understand your answer.

NASSI:   I didn't know his name, I remember his face, his appearance, physical appearance.   Yes.

26

DEFENSE COUNSEL: Now, in your statement that you gave to her, you indicated that you saw something out of the corner of your eye, movement, and then you felt a blow and then the next thing was somebody told you that you had been stabbed. You remember telling her that?

NASSI: Yes.

DEFENSE COUNSEL: And at that point, you were not certain who it was that struck you?

NASSI: I was sure, yes.

DEFENSE COUNSEL: But that's not what you told the investigator at that time. Right?

NASSI: I did. I did.

When Juarez was questioned outside the presence of the jury, she recalled that Nassi was uncertain of his identification:

DEFENSE COUNSEL: Did you make a distinction with Mr. Nassi about this person, is he sure that that was the person who stabbed him or did you ask him a question to that effect?

JUAREZ: Yes, I did.

DEFENSE COUNSEL: And what did he say?

JUAREZ: He said he wasn't sure.

But the State's prosecutor followed up and asked what specific question was asked of Nassi during the interview:

PROSECUTOR: Ms. Juarez, what words did you use specifically to ask Mr. Nassi in regards to if he knew Mr. Soria or didn't know Mr. Soria?

JUAREZ: What I asked him was that if he had -- if he knew the person who had assaulted him, if he had seen him before.

PROSECUTOR: Okay. Are those two different questions, if he knew Mr. Soria and then if you saw the person that did that to him?

JUAREZ: That is correct. Two different questions.

PROSECUTOR: Okay. What was his response to that if he knew the person who stabbed him?

27

JUAREZ: He stated that he did not know him.

PROSECUTOR: And then there was a follow-up question to that. What was that follow-up question?

JUAREZ: If he had previously seen him.

PROSECUTOR: Okay.

JUAREZ: Previously seen him, like interacting with him.

PROSECUTOR: Okay. And what was answer to that one?

JUAREZ: He said no. Not prior to the date of the incident.

Following this last exchange, the trial court ruled that it would not allow Juarez's testimony because Appellant had not laid a proper predicate for the admission of a prior inconsistent statement.

Appellant later recalled Nassi and had him confirm that then he testified before the jury and when he spoke to Juarez, he recognized Appellant both as the person kicked out of the bar and as the person who had stabbed him. The trial court again declined to permit Juarez's testimony as a prior inconsistent statement.

### 3. The trial court did not abuse its discretion in excluding Juarez's testimony

Appellant carried the burden of showing that Nassi made a prior inconsistent statement from what he testified to at trial. Here, the trial court did not abuse its discretion in failing to find that Nassi made an inconsistent statement to Juarez. The crux of our conclusion in this regard is the confusion apparent from the record about exactly what Nassi was answering at trial, and what he was asked in his oral statement. One reading of the record is that Nassi had no problem recognizing Appellant as the person who entered the bar and soon after stabbed him. Nassi did not, however, know who he was before that attack. The record is disputable about whether Nassi

28

was answering one of those questions, versus the other, and the trial court could have reasonably found that Nassi had not made a prior inconsistent statement.

Nor do we find an inconsistency in the questions about the photo line-up. Nassi agreed he was shown a photo line-up, and Juarez agreed that Nassi picked Appellant's photo from that line-up. Her only observation was that Nassi had a "hard time making a choice" and appeared "very apprehensive." Nassi was not specifically asked if he was apprehensive about selecting Appellant from the line-up. And he answered yes, when asked if he was "not completely sure" about the photo line-up identification. On direct examination before the jury, he also agreed that he might have told Juarez that he could not identify Appellant from the photo line-up and requested an in person line-up instead. Moreover, without the photo line-up being in our record, we would have no basis to conclude that any error in this one regard meets the standard for reversible error.

### 4. *No violation of Appellant's constitutional rights*

And even if we concluded there was error in excluding the prior statements under Rule 613, it did not deprive Appellant of his constitutional right to present his mistaken-identity defense to the jury. Although a criminal defendant has a constitutional right to have a meaningful opportunity to present a complete defense, erroneous evidentiary rulings rarely rise to the level of denying a defendant the right to present a meaningful defense. *See Potier v. State*, 68 S.W.3d 657, 663 (Tex.Crim.App. 2002). An evidentiary ruling excluding evidence only rises to the level of a constitutional violation if the trial court erroneously excludes otherwise relevant, reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* at 665. Yet the fact that a defendant may have been "unable to . . . present his case to the extent and in the form he desired" does not rise to the level of a constitutional error, if the defendant was not prevented from otherwise presenting the

29

substance of his defense to the jury.  *Id.* at 666, *quoting United States v. Willie*, 941 F.2d 1384, 1398-99 (10th Cir. 1991); *see also Covarrubias v. State*, No. 08-11-00176-CR, 2013 WL 557177, at *2 (Tex.App.--El Paso Feb. 13, 2013, no pet.) (not designated for publication) (same).

Here, despite the exclusion of Nassi's statements to Juarez, Appellant was not wholly deprived of his right to present his defense of mistaken identity to the jury.  Defense counsel questioned Nassi at trial about his identification of Appellant as the assailant, and defense counsel argued extensively to the jury that this was a case of mistaken identity, contending that neither Nassi nor Lozano—the only two witnesses from the bar who were called to testify at trial—had an adequate opportunity to observe Nassi's assailant.   As well, defense counsel argued that the police failed to conduct an adequate investigation, did not take statements from the other individuals who chased Appellant, did not take fingerprints at the scene, and did not take any blood swabs that could have revealed the true identity of the assailant.  In short, Appellant was in fact able to present a meaningful defense to the jury, even if not as fully as he would have liked.

We also disagree with Appellant's argument that the trial court's exclusion of Nassi's prior statements to Juarez deprived him of his Sixth Amendment right to confront witnesses.   While the Sixth Amendment includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying, it only "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Woodall v. State*, 336 S.W.3d 634, 643 (Tex.Crim.App. 2011) (emphasis in original), *citing Delaware v. Fensterer*, 474 U.S. 15, 19 (1985); *see also Wisenbaker*, 2020 WL 6867067, at *5 (same).   Thus, the "*Confrontation Clause* is generally satisfied when the defense is given a full and fair opportunity to probe and expose [forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention

30

of the factfinder the reasons for giving scant weight to the witness' testimony." *Woodall*, 336 S.W.3d at 643, *citing Fensterer*, 474 U.S. at 21-22. And because the right to confront witnesses is not unqualified, "a trial judge has wide discretion in limiting the scope and extent of cross-examination." *Johnson v. State*, 490 S.W.3d 895, 910 (Tex.Crim.App. 2016), *citing Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude" under the Confrontation Clause to impose restrictions on cross-examination based on such criteria as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."); *see also Johnson v. State*, 433 S.W.3d 546, 551-52 (Tex.Crim.App. 2014) (recognizing that trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination," so long as those limits do not infringe on the Confrontation Clause's guarantee of "an *opportunity* for effective cross-examination") (emphasis in original).

Here, as set forth above, defense counsel had the opportunity to cross-examine Nassi about the certainty of his identification of Appellant as his assailant, and we therefore do not find that his Sixth Amendment rights were violated.

### 5. *Appellant was not harmed by the exclusion*

Finding no constitutional violation, any error at most would be reviewed under the non-constitutional error standard. And any non-constitutional error "that does not affect substantial rights must be disregarded." TEX.R.APP.P. 44.2(b). Even assuming some trial court error, we find that it would not affect Appellant's substantial rights. As reflected above, some of Nassi's uncertainty in the identification was already before the jury. He testified that the person who stabbed him looked like the person who had earlier been in the bar. Appellant's cross-examination of Nassi before the jury brought up the photo line-up, and that Nassi picked Appellant

31

out of that line-up. But the jury also heard that he was not completely sure about that identification, and further heard that Nassi (when referring to the photograph) agreed the Appellant had a tear drop tattoo on his face (which he in fact does not have). Thus it is unclear how the added testimony that Juarez might have offered would add to ammunition that Appellant already had to impeach Nassi, particularly since those other questions lack clarity as to what Nassi was being asked by Juarez. Along with the other circumstantial evidence described above linking Appellant to the stabbing, Juarez's testimony would have had little impeachment value on the issue of Appellant's identity. *See generally Seamster v. State*, 344 S.W.3d 592, 601 (Tex.App.--Houston [14th Dist.] 2011, pet. ref'd) (defense counsel's failure to present evidence in which witness to a robbery made an out-of-court statement to a media outlet that he was either unable or unwilling to identify the defendant in a photo lineup did not prejudice Appellant's case, where the witness made an on-scene identification of defendant and testified in court that he was certain of his identification, and never told media outlet that he could not affirmatively identify the defendant as the robber).

### B. The Prior Statements about the Victim's Compensation Fund

Finally, Appellant contends that the trial court erred in excluding evidence relating to Nassi's conversation with Juarez in which they discussed his right to receive compensation from the county's victim assistance fund. Specifically, Appellant contends that during the pretrial interview, Nassi questioned Juarez about whether he would still be eligible to receive compensation from the fund if he did not "testify against" Appellant. Appellant argues that the fear of losing eligibility for compensation established a motive for Nassi to continue to "falsely accuse" Appellant of the stabbing.

32

Appellant premises the admissibility of the evidence as prior inconsistent statements under Rule 613. As well, he contends that the statement was relevant to impeach Nassi's credibility, and that the trial court's exclusion of the statement violated his Sixth Amendment right to confront his witnesses and his Constitutional right to present a meaningful defense. We conclude, however, that Appellant failed to establish the existence of any prior inconsistent statements, and further failed to demonstrate the relevance of the statements.

### 1. No evidence of a prior inconsistent statement

Although Appellant contends on appeal that Nassi's conversation with Juarez about the victim's compensation fund was inconsistent with Nassi's recollection of it at trial, Appellant never laid a proper foundation to establish that he made any inconsistent statements to Juarez on this subject. At trial, Nassi testified that he did not ask Juarez about the compensation issue, but did mention to her that he had been interviewed by someone from "victim's assistance" when obtaining compensation for his injuries. He testified that she then responded that "there was a chance that they would not assist [him] with medical bills," if he did not testify. Nassi testified that this concerned him as he could not work at the time due to his injuries, but that despite Juarez's statement to him, he did not believe that he needed to testify against Appellant to receive compensation.

Although defense counsel argued to the trial court that Nassi brought up the subject of compensation to Juarez and expressed concern to her that he might not receive compensation if he did not testify against Appellant, he never established that Nassi made any such statements to her. In his voir dire of Juarez, defense counsel limited his questions to the issue of whether Nassi expressed uncertainty about his ability to identify his assailant during the pretrial interview, and he did not question Juarez about their conversation involving the victim's compensation fund.

33

And there is nothing else in the record save for counsel's arguments suggesting that Nassi made any inconsistent statements to Juarez on this subject. As a result, Appellant failed to lay a proper foundation to establish that Nassi made the alleged prior inconsistent statements to Juarez. *See, e.g.*, *Wisenbaker v. State*, No. 08-19-00034-CR, 2020 WL 6867067, at *4 (Tex.App.--El Paso Nov. 23, 2020, no pet.) (not designated for publication) (appellant failed to preserve error where he failed to make an adequate offer of proof that a prior inconsistent statement existed).

### 2. *No violation of Appellant's constitutional rights*

We also conclude that the trial court's ruling excluding the alleged statements did not violate Appellant's Sixth Amendment right to confront a witness's purported bias. The Sixth Amendment provides a defendant with the right to cross-examine a witness's credibility, or to demonstrate a possible bias or motive for lying. But that right is not unqualified, and a trial court may limit the scope and extent of cross-examination for various reasons, including to prevent confusion of the issues at trial, or interrogation that is only marginally relevant.[14] *Johnson,* 490 S.W.3d at 910, *citing Van Arsdall,* 475 U.S. at 679. Here, the trial court limited Appellant's right to cross-examine Nassi about his statements to Juarez about the victim's compensation fund, finding that the conversation was not relevant to the issue of Appellant's credibility and would have unduly confused the jury. In particular, the trial court expressed a concern that allowing an inquiry into that issue would open the door to "litigating the purpose of the Victim's Assistance

---

[14] The Texas Rules of Evidence allow for a similar restriction, allowing a trial court to exclude otherwise relevant evidence to avoid confusing the issues and misleading the jury. *See* TEX.R.EVID. 403 (trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence); *Henderson v. State*, 29 S.W.3d 616, 627 (Tex.App.--Houston [1st Dist.] 2000, pet. ref'd) ("Confusion of the issues occurs when introduction of the contested evidence raises 'the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues.'") (citation omitted); *see also Barajas v. State*, No. 08-97-00405-CR, 2003 WL 21674201, at *5 (Tex.App.--El Paso July 17, 2003, no pet.) (not designated for publication) ("Confusion of the issues can occur when admitting certain evidence raises the probability that a side issue may be created which will unduly distract from the main issues in the case.").

34

Fund and how it works," and the court did not believe that this was an appropriate subject for the jury's consideration. Under the record here, nor do we. The version of the Code of Criminal Procedure in effect at the time of Appellant's offense only required the victim of a violent crime to timely report the offense, to provide truthful information in his application, and to cooperate with law enforcement officials to apply for compensation for his injuries. [15] In other words, nothing in the relevant statutes would have required Nassi to identify Appellant as his assailant in order to receive compensation, and in fact, he could have been denied compensation for falsely accusing Appellant of the offense. TEX.CODE CRIM.PROC.ANN. art. 56.63(a)(2), *repealed by* Acts 2019, 86th Leg., ch. 469, § 3.01(2), 2019 TEX.GEN.LAWS 1150 (current version found at TEX.CODE CRIM.PROC.ANN. art. 56B.501) (imposing an administrative penalty for knowingly providing false information in a compensation application). As a result, it could have been misleading and confusing to the jury to introduce evidence suggesting that Nassi had a motive to falsely accuse Appellant of the stabbing in order to receive compensation, when in fact he would have had no reason to do so. *See generally Rivera v. State*, No. 03-09-00101-CR, 2010 WL 3619945, at *3 (Tex.App.--Austin Sept. 15, 2010, no pet.) (mem. op., not designated for publication) (finding that defendant's assertion that rape victim had a motive to falsely accuse him of rape because she sought to obtain Crime Victim's Compensation funds to pay for an abortion was "illogical," as victim would have no "reason to falsely accuse [the defendant] in order to obtain the funds").

---

[15] At the time of Appellant's offense, the compensation provisions were found in Chapter 56 of the Texas Code of Criminal Procedure, but those provisions were repealed effective 2021, and replaced with the current provisions found in Chapter 56B. Although the statute was renumbered and replaced by the current version of the statute, the requirements for filing an application and receiving compensation remain substantially the same. *See* (Former) TEX.CODE CRIM.PROC.ANN. arts. 56.41(b)(1-7); 56.45; 56.46(a)(1), *repealed by* Acts 2019, 86th Leg., ch. 469, § 3.01(2), 2019 TEX.GEN.LAWS 1150 (current versions found at TEX.CODE CRIM.PROC.ANN. arts 56B.053(a) 56B.057(b)(1)(7); 56B.107(a)(1)).

For similar reasons, we do not believe that the trial court's decision to exclude the evidence pertaining to Nassi's conversation with Juarez about the victim's compensation fund denied Appellant the opportunity to present a meaningful defense. As explained above, an evidentiary ruling excluding evidence only rises to the level of a constitutional violation if the trial court erroneously excludes otherwise relevant, reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier*, 68 S.W.3d at 665. As discussed above, the evidence pertaining to his discussion with Juarez about the victim's compensation fund was neither relevant nor reliable. Nor do we believe that it formed a vital portion of Appellant's defense of mistaken identity, such that it rose to the level of a constitutional violation, particularly since Appellant could attack Nassi's identification of him in other alternate ways. *See Hammer v. State*, 296 S.W.3d 555, 567-68 (Tex.Crim.App. 2009) (exclusion of evidence related to witness's motive to lie did not rise to the level of a constitutional error, where defendant's "general defensive theory was presented to the jury through alternate testimony). Thus, we reject Appellant's argument that the trial court violated his constitutional rights by excluding this evidence.

Appellant's Issue One is overruled.

## VI. CONCLUSION

The trial court's judgment is affirmed.


JEFF ALLEY, Justice

July 27, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

36